UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

GEORGETTE KEMP,

                                            Plaintiff,

            v.                                                        7:10-CV-1244
                                                                       (GLS/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                            Defendant.
_____

LAWRENCE D. HASSELER, ESQ., for Plaintiff
MARIA FRAGASSI SANTANGELO, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

        This matter was referred to me for report and recommendation by the Honorable

Gary L. Sharpe, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b)

and Local Rule 72.3(d).  This case has proceeded in accordance with General Order

18.

## I.    PROCEDURAL HISTORY

        Plaintiff filed[1] an application for disability insurance benefits on March 4, 2008,

claiming disability since February 17, 2007.  (Administrative Transcript (hereinafter

"T.") at 144–150).  Plaintiff's applications were initially denied on June 12, 2008, and

she requested a hearing before an ALJ.  (T. 46–47, 84).  Plaintiff testified at the

---

[1] In his decision, the Administrative Law Judge (ALJ) stated that plaintiff "protectively filed" her application on January 16, 2008.  (T. 9).  When used in conjunction with an "application" for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits.  *See* 20 C.F.R. § 416.340.  There are various requirements for this written statement.  *Id.*  If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a future date.

hearing, which was conducted on May 12, 2010.  (T. 24–53).

In his June 25, 2010 decision, the ALJ found that plaintiff was not disabled.  (T. 8–23).  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on September 28, 2010.  (T. 1–3).

## II.   ISSUES IN CONTENTION

The plaintiff makes the following claims:

1.   The ALJ failed to properly assess the severity of plaintiff's impairments. (Plaintiff's Brief (Pl.'s Br.) at 9–13).

2.   The ALJ failed to properly evaluate plaintiff's residual functional capacity (RFC).  (Pl.'s Br. at 13–18).

3.   The ALJ erred in determining there was other work the plaintiff could perform in the national economy.  (Pl.'s Br. at 18–20).

For the reasons below, the court will recommend affirming the Commissioner's decision.

## III.   APPLICABLE LAW

### A.   Disability Standard

To be considered disabled, a plaintiff seeking disability insurance and supplemental security income benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ."  42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

2

physical or mental impairment or impairments [must be] of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. § 404.1520 and in 416.920 to evaluate disability insurance and SSI disability claims.

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If [she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider [her] disabled without considering vocational factors such as age, education, and work experience . . . .  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [she] has the residual functional capacity to perform [her] past work.  Finally, if the claimant is unable to perform [her] past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920.  The plaintiff has the burden of establishing disability at the first four steps. *Id*.  However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step.  *Id*.

## B.   Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)). A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986. In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)); *Williams*, 859 F.2d at 258.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the

evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

## IV.    MEDICAL EVIDENCE[2]

Plaintiff claims disability, beginning in February or 2007, based on a variety of physical and mental impairments, including scoliosis, affective disorder, substance abuse disorder, asthma, arthritis in her shoulder, high cholesterol, and migraine headaches.  The record contains a March 23, 2006 report from Dr. Zofia Mroczka, a neurologist.[3] (T. 237-40).  Dr. Mroczka examined the plaintiff and noted that she was no longer taking anti-seizure medication and had been "seizure free for almost two years." (T. 239).  Dr. Mroczka stated that a recent MRI of plaintiff's brain showed no abnormalities.  (T 239).  A CT scan of plaintiff's brain on August 24, 2006, showed no hemorrhage, infarction, or lesions.  (T. 235).  On October 3, 2006, plaintiff reported that her headaches had improved by eighty percent, and that she had not had a seizure in almost three years.  (T. 237).  Dr. Mroczka diagnosed plaintiff with tension

_____

[2] The court would point out that plaintiff is originally from Connecticut and many of her medical records are from providers in Connecticut.

[3] It appears from Dr. Mroczka's reports that plaintiff was referred to her by plaintiff's primary care providers at Generations Family Health Care Centers ("GFHC"). (T. 237, 239).  Although there are only two reports from Dr. Mroczka in the record, the first report states that the plaintiff was in for a "follow-up" appointment, indicating prior treatment by this doctor. (T. 239).

headaches and a single-episode seizure.[4]  *Id*.  On June 20, 2007, another CT scan of plaintiff's brain revealed no acute abnormalities.  (T. 236).

On January 15, 2007, plaintiff went to the Generations Family Health Center (GFHC), complaining of pain in her left shoulder that had been bothering her for a few months.  (T. 266).  An MRI of plaintiff's shoulder showed moderate arthritis, and the treating nurse, Julie Trainor, referred plaintiff to Dr. Kevin Reagan, an orthopedic surgeon.  (T. 266).  Plaintiff told Nurse Trainor that she smoked a half-pack of cigarettes per day.  (T. 266).  During a follow-up visit on February 27, 2007, Nurse Trainor reported that Dr. Reagan gave plaintiff a cortisone injection, and that plaintiff was going to meet with Dr. Reagan on March 7, 2007, to discuss surgical options.  (T. 262).

Dr. Reagan performed a left shoulder arthoscopic acromioplasty and distal clavicle resection on April 2, 2007.  (T. 251).  During the surgery, Dr. Reagan took the plaintiff's shoulder through a range of motion, and noted that there was no further impingement.  (T. 251).  Plaintiff began physical therapy for her shoulder on April 5, 2007.  (T. 250).  On April 12, 2007, plaintiff told Nurse Trainor that the physical therapy was already helping. (T. 261).  Plaintiff's physical therapist noted that plaintiff reported no pain in her shoulder, and she was discharged from physical therapy on May 2, 2007.  (T. 241).  On December 4, 2008, plaintiff visited GFHC complaining of

---

[4]  The court does note that other medical records indicate plaintiff had suffered from *two* prior seizures, one on November 21, 2002, and another in January 2003, but January 2003 was clearly the last episode of alleged seizures.  (*See* T. 277).

pain in her neck and back. (T. 355–56). A few months later, on March 4 and May 27, 2009, she continued to complain of right shoulder pain (T. 346–347, 359–60).

Beginning on August 14, 2006, plaintiff attended "mental health therapy" once or twice per month at United Services, Inc. (T. 272). In April of 2008, Tina Lekacos, a Social Worker from United Services, Inc. completed a "Mental Health Questionnaire" for plaintiff.[5] (T. 272-75). The questionnaire stated that plaintiff was diagnosed with bipolar disorder and cannabis abuse in full remission. (T. 272). The questionnaire also stated that plaintiff often suffered from a depressed mood, occasional suicidal thoughts, and low self-esteem. (T. 272–74). However, the questionnaire also indicated that in the past year, plaintiff's functioning had been gradually improving. (T. 272).

The questionnaire also asked about plaintiff's "Activities of Daily Living" ("ADLs"), "Social Interactions," and "Task Performance." (T. 273-74). Plaintiff had "no problem" using good judgment regarding safety and dangerous circumstances, respecting/responding appropriately to those in authority, carrying out single-step instructions, focusing long enough to finish simple tasks, and changing from one simple task to another. *Id.* Plaintiff would only have a "slight problem" taking care of personal hygiene, caring for her physical needs, and asking questions or requesting assistance "at times." *Id.* In the categories of handling frustration, the reviewer

---

[5] The questionnaire was co-signed by two other individuals, one of whom is clearly a physician because there appears to be an "MD" after the name, but the signatures are completely illegible. (T. 275).

marked both a slight problem and an obvious problem. (T. 273).  With respect to

carrying out multi-step instructions, the social worker circled both "no problem" and

"a slight problem." (T. 274).  Finally, the social worker wrote "unknown" regarding

plaintiff's ability to use appropriate coping skills to meet the ordinary demands of a

work environment, interacting appropriately with others in a working environment,

and getting along with others without distracting them or exhibiting behavioral

extremes. (T. 273-74).  As a "comment" in reference to plaintiff's ability to get along

with others, the social worker wrote that plaintiff "struggles with her mental health

symptoms and has low self esteem." (T. 274).  In another one of the "comments"

boxes, the social worker wrote that if tasks were not simple, plaintiff might have a

slight to obvious problem. (T. 274). There was no rating for the ability to perform

basic work activities at an appropriate pace and no rating for the length of time that

plaintiff would be able to perform basic work activities.[6] (T. 274).

Plaintiff continued her treatment at United Services until June 10, 2009.[7] (T.

363–429).  In addition to Tina Lekacos, plaintiff worked with various staff members at

---

[6] In a note written by Dr. Lewis S. Goldberg, Ph.D., dated May 19, 2008, he wrote that the person completing the "MSQ" only saw the plaintiff for individual counseling, and thus could not comment on plaintiff's ability to work with others or any distracting behaviors. (T. 276).  Dr. Goldberg stated that there was a "group therapist" who could comment on these abilities, but that person was "on vacation." (T. 276).  Dr. Goldberg's note stated that if he could get some more information from that person, it would help with the MSQ and decision. *Id.*  Dr. Goldberg also commented that the plaintiff's "ADLs sound[ed] pretty severe but it is a self-report measure." *Id.* Later, Dr. Goldberg obtained additional information in order to complete his consultative report, discussed below. (*See* T. 295, 299-30).

[7] The records indicate that plaintiff's treatment at United Services lasted until June 24, 2009, but a review of the transcript shows that plaintiff cancelled her last two appointments. (T. 361-64).

United Services,  On September 3, 2008, Linda Lamoureux, a licensed alcohol and drug abuse counselor, noted that plaintiff was "falling back both in substance use and dealing with mood."  (T. 428).  Plaintiff told her counselor that plaintiff quit her job because "it was too overwhelming to her." (T. 428).  Subsequently, plaintiff complained to her counselors of depression due to homelessness. (*See e.g.* T. 415, 417, 427, 420, 421).  She lived in her car with her boyfriend. *Id.*  On December 2, 2008, plaintiff told her counselor that she had been involved in an accident with her boyfriend's car in November of 2008, but they were still able to live in the car.[8] (T. 410).  She began to feel better when they obtained temporary housing. (T. 403-407).  In April of 2009, plaintiff reported she was feeling better because she had a more permanent place to live. (T. 376).

On March 10, 2009, plaintiff's counselor, Linda Lamoureux, noted that plaintiff had been using marijuana for the prior three weeks and was again struggling with depression due to reduced income.  (T. 385).  Plaintiff left treatment in June 2009, and the Progress Notes for June 3, 2009, indicated that plaintiff's mood was euthymic and she did not appear anxious or depressed.  (T. 367).

On August 20, 2009, plaintiff was evaluated by Dr. Muhammad Saleem, a psychiatrist from the Ogdensburg Mental Health Clinic. (T. 430-33[9]).  Plaintiff told

---

[8] Images of plaintiff's spine taken on November 30, 2008, after plaintiff was involved in a motor vehicle accident, revealed no "evident" abnormality.  (T. 358; see also T. 355).  The record does not indicate what kind of "images" were taken.

[9] The court notes that (T. 435-39) are duplicates of (T. 430-33).

Dr. Saleem that she had frequent suicidal thoughts, but said she did not plan on acting on them. (T. 430–31). She also told Dr. Saleem that she had attempted suicide three times in the past and had been hospitalized in Connecticut four times for psychiatric illness. (T. 430, 435). Dr. Saleem diagnosed bipolar disorder, "depressed," alcohol abuse (by history), cannibis abuse (by history), esophageal reflux, chronic airway obstruction, allergy (unspecified), and epilepsy (unspecified). (T. 431-32). Dr. Saleem measured plaintiff's Global Assessment of Functioning (GAF) at 60. (T. 433). Dr. Saleem concluded that plaintiff needed therapy/counseling to help treat her symptoms of depression and mood swings. (T. 433). He also stated that plaintiff needed help adjusting to her new environment as she had recently moved to the area. *Id.*

Plaintiff continued her treatment with Dr. Saleem. The record contains a report, dated February 12, 2010, stating that the plaintiff was feeling well, her sleep was good, her appetite was good, and she had been taking her medications regularly. (T. 434). Doctor Saleem concluded that plaintiff was "showing improvement" and did not change her medications at that time. *Id.*

Plaintiff was referred to Dr. Ronald Jolda for a consultative examination by the State of Connecticut, Bureau of Rehabilitation Services, Disability Determination Services. (T. 281). In a report, dated May 23, 2008, Dr. Jolda stated plaintiff had a "quiet seizure disorder," and that plaintiff's last two seizures were on November 21, 2002, and January, 2003. (T. 277–280). Plaintiff told Dr. Jolda that she continued to

have headaches, but was treating them with over-the-counter analgesics.  (T. 277).  Dr.
Jolda concluded that plaintiff's headaches were tension related.  (T. 280).  Dr. Jolda
also noted that plaintiff suffered from minor scoliosis, and experienced pain in her
lower back when she sat or stood for longer than 30 minutes.  (T. 278).  Plaintiff
reported that she would have to change position to alleviate the pain.  *Id*.  Dr. Jolda
indicated that "both shoulders have full [range of motion] and are non-tender to
palpation and are normal."  (T. 279).  Plaintiff told Dr. Jolda that she smoked a pack
of cigarettes per day. (T. 277).  Dr. Jolda stated that plaintiff did not have chronic
obstructive pulmonary disease, and that plaintiff had not been hospitalized in the past
year for her asthma, but used inhalers and medications regularly.  (T. 277, 280).

Plaintiff was also treated at Heuvelton Health Center ("HHC") in New York
State.  The record contains a report, dated July 27, 2009, based upon a visit to HHC
for a New York State Department of Social Services physical for "medical and
financial assistance." (T. 453-54).  The report states that plaintiff had recently moved
to "the area" to be with her father. (T. 453).  The report is signed by Jean Belligner, a
Nurse Practitioner (NP). (T. 454).  The report states that plaintiff "does not appear to
have any physical ailments," and that "for walking there is no evidence of limitations
for more than 4 hours a day, for moderate limited, possibly 2 to 4 hours a day
standing, sitting, lifting, pushing, pulling, vision, hearing, speaking, stairs, climbing."
(T. 453–54).

Plaintiff complained of pain in her right shoulder during a visit to Heuvelton

11

Health Center on October 1, 2009, and stated that she had injured her right shoulder, neck, and back in the November 29, 2008, car accident.  (T. 444).  The report indicated that when plaintiff was seen at Heuvelton Health Center in July 2009, she did not complain of any physical concerns or shoulder pain.  (T. 444).  During the October 2009 visit, however, plaintiff reported that she had difficulty bringing her right arm across her shoulder, and NP Bellinger noted that plaintiff appeared to only be able to move her right arm "approximately one-fourth of the normal rotation."  (T. 444).  Plaintiff told NP Bellinger that she had quit smoking in August 2009, and NP Bellinger stated that plaintiff had audible wheezes posteriorly, and she was taking Advair for her asthma.  (T. 456).

On November 4, 2009, plaintiff reported that she could not move her arm higher than a 45-degree angle and that she had "pain releasing across her chest."  (T. 446).  Plaintiff returned to Heuvelton Health Center on November 17, 2009, for a follow-up visit to review an MRI, which revealed moderate osteoarthritic changes, which were deemed to be posttraumatic or osteoarthritic in nature.  (T. 448).

Plaintiff returned to the Heuvelton Health Center on June 28, 2010, complaining of lower back pain, but did not mention shoulder pain, and Allison Smith, Physician Assistant (PA), noted "strength is 5/5 upper and lower extremities." (T.459).  PA Smith also noted that plaintiff's lungs were clear, but that plaintiff reported that she smoked seven to eight cigarettes per day and was still using Advair. (T. 459).  An x-ray of plaintiff's lumbar spine revealed moderate degenerative

changes.  (T. 462).

The record contains reports from two non-examining physicians, Dr. Nathaniel Kaplan and Dr. Dinesh Shah.  (T. 301-308; 310-17).  On June 9, 2008, Dr. Nathaniel Kaplan noted that plaintiff had remained seizure-free since 2003 (nearly five years), despite being off anti-seizure medication, and that she had a  "completely normal musculoskeletal exam (just minimal scoliosis but full [range of motion] in back)."  (T. 306, 308).  Dr. Kaplan wrote that plaintiff would have no limitations pulling or pushing and would be able to pull fifty pounds upward.  (T. 302).  He concluded that plaintiff had no severe limitations due to arthritis.  (T. 306). On August 7, 2008, Dr. Shah also completed a Physical Residual Functional Capacity Assessment, and also reported that plaintiff's musculoskeletal exam was normal, plaintiff's back had a full range of motion, despite minimal scoliosis, and she had no limitations due to arthritis. (T. 315, 317).

## V.    TESTIMONY and NON-MEDICAL EVIDENCE

Born on November 20, 1968, plaintiff was 41 years old at the time of the ALJ's hearing.  (T. 25).  At the time of the hearing, plaintiff testified that she lived in a house with her boyfriend and his seven year-old son.  (T. 31).  However, she also stated that she did not provide care for anyone else, and she did not normally provide care for her boyfriend's son.  (T. 26, 31).  Plaintiff held jobs as a laborer, a sandwich maker, a shift supervisor of a fast food restaurant, and as a salesclerk in a convenience store.  (T. 42).

Plaintiff testified that she last worked on January 23, 2003, but stopped working after she had two seizures at work.  (T. 26).  She testified that the psychiatrists she had been seeing in Connecticut told her that she could not work.  (T. 27).  Plaintiff testified that she had problems with drugs in the past, but at the time of the hearing, was clean and sober, and stayed clean and sober by going to substance abuse counseling once a week.  (T. 34).

Plaintiff testified that she had suicidal thoughts, but never acted on them.  (T. 28).  She also testified that she had anxiety attacks in public places or when she went shopping by herself.  (T. 28).  Plaintiff testified that when she became depressed, she would stay depressed for weeks at time.  (T. 34).  When depressed, plaintiff testified that she would stay in her pajamas, would not shower or clean, would stay in bed or watch television, and would cry all day.  (T. 34–35).  Plaintiff testified that her last depressive episode was the week prior to the hearing.  (T. 35).

Plaintiff further testified that she did not like to be around other people, including family members, and would rather stay at home alone.  (T. 29).  Plaintiff testified that her memory and concentration were poor, and she did not like to go on long drives because she would forget where she was going.  (T. 29–30).  Plaintiff testified that she had problems with authority figures, because she "[could not] take people telling [her] what to do," and when she failed to do exactly, or failed to understand exactly, what her boss told her to do, it would cause problems, and she would often lose her job as a result.  (T. 37).

14

Plaintiff testified that she could cook, do dishes, make beds, and vacuum. (T. 30–31). She also testified that her hobbies were crocheting and reading novels, but that she could only concentrate on reading for five to ten minutes at a time. (T. 29–30). Plaintiff also testified that standing for more than twenty minutes caused her lower back pain, but that she could stand and bend over to touch her knees. (T. 28–29).

Plaintiff testified that on a normal day she would get up around seven o'clock in the morning, eat a bagel or toast with coffee, and smoke a cigarette. (T. 31). She testified that she watched television in her living room, let her three dogs out, and watched more television. (T. 32). Plaintiff testified that, for the rest of the day, she would tidy the house, and her boyfriend would help her with the rest of the housework when he came home from work. (T. 33).

In addition to scoliosis and bipolar disorder, plaintiff testified that she had an enlarged bladder and two fibroid tumors, which gave her urinary incontinence. (T. 38). She testified that the medications she took caused nausea, vomiting, constipation, and fatigue. (T. 38, 40). Plaintiff testified that she continued to have a prescription for Advair and used an albuterol inhaler three to four times per week for her asthma. (T. 39–40).

## VI.   ALJ'S DECISION

The ALJ found plaintiff had not engaged in substantial gainful activity since February 17, 2007, the alleged onset date, and plaintiff had the following severe

impairments: mild scoliosis, affective disorder, and substance abuse disorder.  (T. 11).
The ALJ found that the record contained evidence of the following non-severe
impairments: asthma, arthritis of the shoulder, high cholesterol, and migraine
headaches.  (T. 12).  However, the ALJ found that plaintiff's allegations of chronic
obstructive pulmonary disease (COPD), acid reflux, and irritable bowel syndrome
were not supported by medical evidence, and they were thus not medically
determinable impairments.  (T. 12).

The ALJ found that plaintiff did not have an impairment or combination of
impairments that met or medically equaled one of the impairments listed in 20 C.F.R.
Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526,
416.920(d), 416.925, and 416.926).  (T. 13).  The ALJ considered listings 1.00(L)
(abnormal curvatures of the spine), 12.04 (affective disorders), and 12.06 (anxiety
disorders), but found that plaintiff's impairments did not meet the specific
requirements of the listings.  (T. 13–14).

The ALJ found that plaintiff could perform light work,[10] except that she was
limited to occasional climbing of ladders and scaffolds, and to occasional crouching.
(T. 14).  Because of plaintiff's mental limitations, the ALJ found that she could only

---

[10] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or
carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a
job is in this category when it requires a good deal of walking or standing, or when it involves
sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered
capable of performing a full or wide range of light work, [plaintiff] must have the ability to do
substantially all of these activities.  If someone can do light work, we determine that he or she
can also do sedentary work, unless there are additional limiting factors such as loss of fine
dexterity or inability to sit for long periods of time."  20 C.F.R. §§ 404.1567(b), 416.967(b).

perform one- or two-step tasks and could only have occasional interaction with others. (T. 14).  The ALJ further found that the objective medical evidence contradicted plaintiff's testimony, and that plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible to the extent they were inconsistent with the RFC.  (T. 17).  The ALJ also stated that plaintiff's history of marijuana use, and evidence that her conditions improved when she stopped using drugs, further detracted from her credibility.  *Id*.

Although the ALJ determined plaintiff had past relevant work experience as a laborer, sandwich maker, manager, and sales clerk, he found plaintiff would be unable to return to her previous work due to her impairments.  (T. 18).  The ALJ consulted a vocational expert (VE), who testified that plaintiff could work as a hand packer, production worker, or production inspector.  (T. 43).  The VE stated that there were 163,000 hand packer jobs, 100,000 production worker jobs, and 16,000 production inspector jobs in the national economy and 1,800 hand packer jobs, 900 production worker jobs, and 220 production inspector jobs in Connecticut.[11]  *Id*.  The ALJ found plaintiff was not disabled.  (T. 19).

## VII.  DISCUSSION

### A.  Severe Impairments

#### 1.  Applicable Law

At Step 2 of the Commissioner's sequential analysis, the ALJ must evaluate

_____

[11] Plaintiff was living in Connecticut when she first filed her disability application.  (T. 50–63).

whether the plaintiff has a severe impairment that significantly limits her ability to do basic work activities. *See* 20 C.F.R. § 404.1520(a)(ii). Basic work activities include the ability to walk, stand, sit, lift, push, pull, reach, carry, handle, see, speak, and hear. 20 C.F.R. 404.1521(b)(1)–(5). The severity requirement is used to screen out *de minimis* claims. *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995). The threshold showing required to establish the requisite level of severity is modest, *Hurlbert v. Comm'r of Social Sec.*, No. 6:06-CV-1099, 2009 WL 2823738, at *10 (N.D.N.Y. Aug. 31, 2009), and where the evidence of impairment rises above the *de minimis* level, further analysis is required. *Kelly v. Astrue*, 09-CV-1359, 2011 WL 817507, at *4 (N.D.N.Y. Jan. 18, 2011) (citing *Dixon v. Shalala*, 54 F. 3d 1019, 1030 (2d Cir. 1995)). However, a finding that an impairment is not severe may be made *when medical evidence establishes a slight abnormality,* which would have no more than a minimal effect on an individual's ability to work. *Bowen v. Yuckert*, 482 U.S. 137, 154 n.12 (1987) (internal quotations omitted); SSR 88-3c.

Often when there are multiple impairments, and the ALJ finds that only some of the impairments, but not others, are severe, any error in the severity analysis is harmless because the ALJ continues with the with the sequential analysis, and does not deny plaintiff's application based the second step alone. *See Cook v. Astrue*, No. 08-CV-1351, 2011 WL 2490996, at *4 (N.D.N.Y. May 24, 2011) (RR, Bianchini, M.J.), *adopted* June 22, 2011 (McAvoy, SJ) (finding any error in the severity analysis was harmless because the regulations require that non-severe impairments be

considered in addition to severe impairments in determining RFC).

### 2.    Analysis

In this case, plaintiff argues that her asthma, her shoulder impairment, seizure disorder, and her headaches are severe impairments, and that the ALJ erred in determining otherwise.  This court finds that the ALJ's findings are supported by substantial evidence, and in any event, any error would have been harmless because the ALJ proceeded beyond step two and considered all of plaintiff's impairments in making the determination that plaintiff could perform other work in the national economy and in determining that plaintiff's claims of additional limitations were not credible. (T. 14-18).

### a.    Asthma

From January through April 2007, plaintiff did not suffer from wheezes, rales, or rhonchi, despite smoking half a pack of cigarettes each day.  (T. 261–66).  On April 12, 2007, Nurse Trainor counseled plaintiff to stop smoking, but plaintiff continued to smoke through the date of her hearing on May 12, 2010, even though it is clear that smoking could exacerbate plaintiff's allegedly severe asthma. (T. 261, 455; *see* T. 31, 37).  On May 23, 2008, Dr. Jolda classified plaintiff's asthma as "mild," and noted that the plaintiff had been not been hospitalized in the previous year for asthma symptoms, had not visited the ER in six months, and had not used an oral steroid in the past year

to relieve asthma symptoms.  (T. 277, 280).  He also found no shortness of breath on exertion.  (T. 278).  Although plaintiff also alleged that she had chronic obstructive pulmonary disease (COPD), affecting her breathing, Dr. Jolda specifically ruled out COPD in his April 2008 report. (T. 280).

On July 27, 2009, NP Bellinger noted that plaintiff's airways were diminished, but no crackles or wheezes were heard.  (T. 442).  She stated that there was no evidence that plaintiff's asthma would limit her ability to walk more than 4 hours a day or to engage in  moderate lifting, pushing, or pulling.  (T. 443).  The ALJ noted that plaintiff stated she had applied for work as a gas station attendant, and found that this fact detracted from plaintiff's credibility regarding the limiting effect of her asthma-related symptoms because "it is difficult to avoid exposure to fumes while working [in a gas station] environment. (T. 12).  The fact that plaintiff has smoked and continues to smoke also belies her claim that she has severe asthma symptoms.  The medical evidence supports the ALJ's conclusion that plaintiff's asthma does not limit her capacity to perform basic work activities and is, therefore, not a severe impairment.

### b.    Shoulder Impairment

Plaintiff had surgery on her *left* shoulder on April 2, 2007, to repair damage caused by arthritis.  (T. 251).  After the procedure, the attending surgeon, Dr Reagan,

noted there was no further impingement on plaintiff's range of motion.  (T. 251).

Plaintiff participated in physical therapy for her shoulder from April 5, 2007, through

May 2, 2007.  (T. 241–250).  Upon discharge, plaintiff reported that her pain was a

"zero out of ten."  (T. 241).

Dr. Jolda found that plaintiff had a full range of motion in her upper extremities

and "both shoulders have full [range of motion] and are non-tender to palpation and

are normal," even though plaintiff indicated that her left shoulder "sometimes bothers

her."  (T. 278–79).  Although plaintiff told NP Bellinger in October of 2009, that

plaintiff hurt her right shoulder in a November 2008 car accident, (T. 444), the

medical records generated directly following the accident, show that plaintiff

complained only of neck pain. (T. 355, 358).  Plaintiff did report right shoulder pain in

March and May 2009, but did not report shoulder pain during a July 2009 exam.  (T.

346, 359–60, 442).  In her July 27, 2009 report, NP Bellinger stated that the plaintiff

"does not appear to have any physical ailments." (T. 442).  In October of 2009, NP

Bellinger repeated that in July of 2009, plaintiff stated that "she did not have any

physical concerns [, and] that she was not able to be employed because she [could not]

be around a lot of people." (T. 444).  An MRI from November 5, 2009, showed

plaintiff had moderate osteoarthritic changes in her right shoulder, with moderate

marrow edema of the lateral clavicular head and the medial aspect of the acromion, but

the cartilage was normal, the bicep tendon was properly seated, and the rotator cuff was intact. (T. 447).

During an examination on June 28, 2010, PA Smith noted that plaintiff's strength in her upper extremities was "five out of five," and there was no evidence that plaintiff complained of shoulder pain during that visit. (*See* T. 459–460). Additionally, plaintiff did not mention any shoulder pain during her June 2010 hearing. (*See* T. 20–45). No doctors found that plaintiff's alleged shoulder pain limited her ability to perform basic work activities. Therefore, the ALJ properly found that plaintiff's alleged shoulder impairment was not severe.

### c.    Seizure Disorder and Headaches

Plaintiff told Dr. Jolda that she blacked out on Nov. 21, 2002, and that people who were nearby told her she had a seizure. (T. 277). Plaintiff reported that she had another seizure in January 2003. (T. 277–278). Dr. Mroczka, a neurologist, treated plaintiff and took her off anti-seizure medication in early 2006. (T. 239). MRIs of plaintiff's brain in March 2006 revealed nothing abnormal. (T. 239). Furthermore, CT brain scan results from October 2006 showed atrophy consistent with plaintiff's age, but no abnormalities. (T. 237). A second CT scan from June 2007 also showed no abnormalities. (T. 236). Dr. Mroczka also changed plaintiff's diagnosis from seizure disorder on March 23, 2006, to "single episode of seizure" on October 3, 2006,

after plaintiff had been seizure-free for three years.  (T. 237, 239).

Plaintiff also reported having migraine headaches.  (T. 239).  However, while plaintiff complained of intense headaches in March 2006, she informed Dr. Mroczka in October 2006 that the headaches had improved by eighty percent.  (T. 237–239).  In May 2008, plaintiff told Dr. Jolda that she still had tension-type headaches, but Dr. Jolda noted that plaintiff obtained relief for these headaches with over-the-counter medication.  (T. 280).

No doctors found that plaintiff's seizures or headaches limited her ability to perform basic work activities.  Plaintiff had been seizure-free for several years. Therefore, the ALJ properly found that plaintiff's seizure disorder and headaches were not severe.

### B.   Residual Functional Capacity/Credibility

#### 1.   Applicable Law

A claimant's residual functional capacity (RFC) is "what an individual can still do despite his or her limitations," in an ordinary work setting, on a regular and ongoing basis.  *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir.1999).  A "regular and ongoing basis" means for 8 hours a day, 5 days a week, or an equivalent schedule.  *Id*. When making an RFC determination, the ALJ considers all of claimant's impairments which may limit her ability to work in an ordinary setting on a regular and ongoing basis.  20 C.F.R. § 404.1545(a).  The ALJ must consider objective medical facts,

diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective

symptoms, including pain and descriptions of other limitations.  20 C.F.R. §§

404.1545, 416.945.

However, an ALJ does not have to accept entirely the credibility of plaintiff's

subjective allegations.  *Marks v. Apfel*, 13 F. Supp. 2d 319, 323 (N.D.N.Y. 1998).  "An

ALJ may properly reject claims of severe, disabling pain after weighing the objective

medical evidence in the record, the claimant's demeanor, and other indicia of

credibility."  *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. Apr. 22, 1999)

(quoting *Gallardo v. Apfel*, No. 96 CIV 9435,1999 WL 185253, at *5 (S.D.N.Y.

March 25, 1999)).  The ALJ may properly find plaintiff's statements to lack credibility

where they are inconsistent with medical findings and plaintiff fails to follow medical

advice. Social Security Ruling ("SSR") 96-7p.  If the ALJ finds plaintiff's contentions

are not credible, the ALJ must state his reasons "explicitly and with sufficient

specificity to enable the court to decide whether there are legitimate reasons for the

ALJ's disbelief."  *Smith v. Astrue*, 09-CV-921, 2011 WL 1205132, at *9 (N.D.N.Y.

Mar. 7, 2011) (quoting *Brandon v. Bowen*, 666 F. Supp. 604, 608 (S.D.N.Y. 1987).

In his decision, the ALJ must also specify the functions a claimant is capable of

performing.  *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728

F.2d 582, 588 (2d Cir. 1984).  Furthermore, the RFC assessment must include a

narrative discussion, describing how the evidence supports the ALJ's conclusions,

citing specific medical facts, and non-medical evidence.  *Trail v. Astrue*, 5:09-CV-

1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing SSR 96-8p). Where substantial evidence in the record exists to support each requirement listed in the regulations, an RFC finding will be upheld. *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y.1990).

### 2.    Analysis

Plaintiff contends that the ALJ's determination that plaintiff could perform light work with some limitations was not supported by substantial evidence, that the ALJ failed to give sufficient weight to her subjective allegations regarding the severity of her symptoms, and that he failed to properly consider the evidence in the record. This court, however, finds that the ALJ's RFC finding was supported by substantial evidence, and that he properly found that, to the extent that plaintiff alleged greater limitations, she was not credible.

### a.    Substantial Evidence

The ALJ found plaintiff could perform light work, limited to one- or two-step tasks, and which involved limited climbing or crouching and only occasional interaction with others. (T. 14). The ALJ properly considered all of plaintiff's impairments, including those that were not severe, and he marshaled substantial evidence in the record to support his RFC finding. (T. 14-18).[12]

---

[12] Plaintiff also claims that important medical information was missing from the record. (Pl.'s Mem. 15). Plaintiff cites a report from Dr. Goldberg which indicated that some information was unavailable while a therapist was on vacation. (T. 276). This argument is unavailing, because Dr. Goldberg's later notes indicate that he was ultimately able to reach both of plaintiff's therapists at United Services and incorporate their input into his report. (T. 299, 309).

Dr. Jolda found that plaintiff exhibited no difficulty moving around, that she walked normally, and she had a normal range of motion in her arms and legs. (T. 278–280). Dr. Kaplan and Dr. Shah, although non-examining physicians, stated in their respective reports, dated June 9, 2008, and August 7, 2008, that plaintiff could stand or walk for six hours in an eight hour workday and could frequently lift or carry 25 pounds. (T. 302, 311). They each also noted that plaintiff had no limitations in manipulating objects, seeing, or communicating. (T. 304, 313). During plaintiff's June 28, 2010 visit to the Heuvelton Health Center, PA Smith noted that the strength in plaintiff's upper and lower extremities was a "five out of five," she walked with a normal gait, and had no obvious deviation in her spine. (T. 459–460).

Dr. Goldberg and Dr. Hahn each noted in their Mental Residual Functional Capacity Assessments, dated June 4, 2008, and August 22, 2008, respectively, that plaintiff had no significant limitations in her ability to remember, understand, and carry out simple directions and had only moderate limitations in her ability to understand, remember, and carry out detailed instructions. (T. 297, 332). Dr. Goldberg also indicated that plaintiff had only mild limitations in her ability to interact socially or to adapt to new situations. (T. 293, 298). Dr. Hahn wrote that plaintiff could understand and perform one or two-step tasks with ordinary levels of supervision. (T. 334). Dr. Hahn further noted that plaintiff could concentrate for at least two hour periods. (T. 334). Dr. Saleem, in his Psychiatric Evaluation dated August 20, 2009, stated that plaintiff's memory was intact, and that her attention and

concentration were fair.  (T. 431).  He also noted that her insight and judgment were
fair at the time.  (T. 439).

### b.    Credibility

Plaintiff also argues that the ALJ failed to evaluate plaintiff's credibility in light
of the seven factors listed in SSR 96-7p.  (Pl.'s Mem. 14).  However, the ALJ does not
have to explicitly address each factor in his decision, and he adequately explained his
credibility determination.  *See Briggs v. Astrue*, 09-CV-1422, 2011 U.S. Dist. LEXIS
73098, 2011 WL 2669476, at *12 (N.D.N.Y. Mar. 4, 2011).

The ALJ noted that plaintiff alleged that she had bipolar disorder, seizure
disorder, insomnia, acid reflux, asthma, allergies, depression, anxiety, adult attention
deficit disorder, high cholesterol, irritable bowel syndrome, scoliosis, arthritis,
migraine headaches, nausea, vomiting, insomnia, an enlarged bladder, an ovarian cyst,
and incontinence, which kept her from functioning normally.  (T. 15–17).  Many of
these alleged impairments have no medical basis in the record, and as stated above,
some are simply not severe.

Dr. Muhammad Saleem, who examined plaintiff on August 20, 2009, assigned
plaintiff a GAF of 60.[13]  (T. 433).  Plaintiff alleged that she had trouble socializing

---

[13]  The GAF is a scale that indicates the clinician's "judgment of the individual's overall level
of functioning."  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental
Disorders* 32 (4th ed., text revision 2000) ("DSM-IV-TR").  The GAF scale ranges from 0 to 100;
GAF scores from 60–70 indicate some mild to moderate symptoms or some difficulty in social,
occupational, or school situations, but the individual is generally functioning well and has some
meaningful interpersonal relationships.  DSM-IV-TR at 34.

with people and would rather stay at home by herself.  (T. 29).  However, notes from office visits indicated she interacted appropriately with others.  Dr. Lewis Goldberg, as part of his psychiatric review, contacted plaintiff's "treating source," and noted that the information he obtained "indicates that [plaintiff] has no difficulty socializing with clinic staff or in treatment which would indicate the capacity to do so in a work setting."  (T. 295).  Dr. Jolda noted on May 23, 2008, that plaintiff was "pleasant and cooperative."  (T. 288).  NP Bellinger noted on July 27, 2009, that plaintiff "interacts appropriately.  As [sic] far as maintaining social, appropriate behavior without exhibiting extremes.  This is a norm."  (T. 454).  Dr. Kaplan, in his consultative examination dated June 9, 2008, stated that plaintiff's subjective allegations were "disproportionate to objective findings," and that her account of her symptoms was "only partially credible."[14]  (T. 306).

In addition, the ALJ found that evidence of marijuana abuse throughout the covered period further detracted from plaintiff's credibility.  (T. 17).  Plaintiff stated she stopped using marijuana in May 2009.  (T. 365).  However, the ALJ noted that at the hearing on May 12, 2010, plaintiff claimed to have been clean and sober "a little over a year and a half."  (T. 17; *see also* T. 33).  The ALJ's findings are supported by substantial evidence, given plaintiff's inconsistent and overstated allegations, thus, the

---

[14] Although Dr. Kaplan did not examine plaintiff, there is nothing in the record to contradict these findings.

ALJ's RFC determination is supported by substantial evidence.

### C.   Significant Work in the Economy

#### 1.      Applicable Law

Because the ALJ found the plaintiff was unable to perform her previous work, the ALJ proceeded to Step 5 of the Commissioner's sequential analysis.  Step 5 requires the ALJ to determine whether the plaintiff's impairments prevent her from adjusting to a type of work different from what she has done in the past.  20 C.F.R. §404.1520(a)(v).  The burden of proof at this step shifts to the ALJ to demonstrate that there is other work in the national economy that plaintiff can perform.  *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982), 20 C.F.R. §404.1560(c)(2).  The ALJ may, under the appropriate circumstances, rely on the "Medical Vocational Guidelines," contained in 20 C.F.R. Part 404, Subpt. P, App. 2, known as "The Grids." *Zorilla v. Chater*, 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (footnotes omitted).  But if plaintiff has non-exertional impairments, and if those non-exertional impairments "significantly limit the range of work" permitted by her exertional impairments, the ALJ may be required to consult a vocational expert (VE).  *Bapp v. Bowen*, 802 F.2d 601, 606 (2d Cir. 1986).  In this case, the ALJ utilized a VE.

If the ALJ does use a VE, he must present the VE with a set of hypothetical facts to determine whether plaintiff retains the capacity to perform any specific job.

*See Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981).  The ALJ may rely on a

VE's testimony regarding the availability of work as long as the hypothetical facts the

expert is asked to consider are based on substantial evidence and accurately reflect the

plaintiff's limitations.  *Calabrese v. Astrue*, 358 Fed. Appx. 274, 276 (2d Cir. 2009).

Where the hypothetical is based on an ALJ's RFC analysis which is supported by

substantial facts, the hypothetical is proper.  *See id*. at 276–277.  The ALJ is not

required to pose a hypothetical that includes non-severe impairments.  *See Dumas v.

Schweiker*, 712 F.2d 1545, 1554 n.4 (2d Cir. 1983).  A plaintiff will be found not

disabled if the ALJ determines the plaintiff can perform work that exists in the

national economy regardless of whether work exists in the immediate area in which

plaintiff lives, a specific job vacancy exists for plaintiff, or plaintiff would be hired if

she applied.  20 C.F.R. §§ 404.1566(a)(1)–(a)(3).

### 2.    Analysis

Plaintiff argues that the hypothetical the ALJ posed to the vocational expert was

improper because it did not account for all of plaintiff's impairments, and the ALJ

improperly relied on VE's testimony regarding the number of available jobs.  (Pl.'s

Mem. 18).

The VE testified that a person who could perform work at the medium level, but

who could only perform two-step tasks, work with others on a limited basis, and only

occasionally climb ladders or scaffolds or crouch could not perform plaintiff's past

relevant work, due to the interaction with the public and co-workers.  (T. 42).

The VE testified that for work as a hand packer at the unskilled, medium level, 163,000 jobs existed in the national economy and 1,800 jobs existed in the Connecticut regional economy (where plaintiff initially filed her claim).  (T. 43).  The ALJ later found that plaintiff could only perform "light" work with some limitations, however, the VE testified that the "numbers would be higher at the light level." (T. 43).  From his subsequent statements, it is clear that the VE was referring to hand packer jobs that were "light" level jobs.[15]  *Id.*  He also stated that a similar number of jobs would be available in New York State, and that the "numbers would be fairly similar in the two regions.  We are not talking a big difference." (T. 44).  The ALJ was entitled to rely on the national job numbers and was not required to find that jobs existed in area where plaintiff lived.  *See Colon v. Comm'r of Soc. Sec.*, 6:00-CV-0556, 2004 WL 1144059, at *8 (N.D.N.Y. Mar. 22, 2004) (The ALJ properly relied on VE's testimony that 100,000 jobs existed in the national economy, and claimant's contention that jobs were unavailable in his region "failed to consider the proper legal standard.").

---

[15] The ALJ asked whether "these jobs – numbers be consistent also at the light level?" (T. 43).  The VE responded that "[t]he numbers would be higher at the light level." *Id.*  The ALJ asked the VE whether he had the "DOTs . . . . for the light level if you can do that." *Id.*  The VE then told the ALJ that "a representative DOT for hand packer at the light level would be 902.687-166; for production worker, 726.687-042; and for production inspector, 733.687-062." *Id.*  Thus, when the VE testified that the "numbers" would be higher at the light level, he meant the numbers of there were even more of the jobs he mentioned at the light level than at the medium level.  *Id.*

As discussed above, the ALJ's RFC determination was supported by substantial evidence, and thus, the hypothetical the ALJ posed to the vocational expert was proper, based on the ALJ's RFC assessment. The ALJ properly applied the correct legal standards, and his findings were supported by substantial evidence from the record.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the decision of the Commissioner be **AFFIRMED**, and plaintiff's complaint be **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: August 11, 2011

Hon. Andrew T. Baxter
U.S. Magistrate Judge